Thank you, Your Honor. I am Craig Kennedy. I'm counsel for Sadine Kesko and I'll reserve any time that's left. Twelve-year-old Sadine Kesko fled from the war-torn, balkanized Yugoslavia in 2000 and entered the United States as a refugee in New York and then adjusted to permanent residency shortly after entering the United States. Today, we're actually reviewing the matter before the immigration judge and then the appeal before the BIA. Before the immigration judge, a master of social work named Kathleen Pruitt testified to Mr. Kesko's PTSD and depression, to its onset and the violent history that he witnessed at age 6 through age 12 until he left Bosnia-Herzegovina. She also did a psychological assessment, which is included in the record, which confirms the diagnosis, the onset, and the events that caused it. And I do want to back up for a moment and say, in this particular record before the immigration judge, she did opine as to the credibility of the witnesses and the documents entered in the record, and she found them all credible. The BIA did not comment about the credibility of the witnesses. There's also no comment by the IJ or the BIA about corroboration of any of the underlying testimony or any of the underlying documentary evidence. The BIA didn't comment about it. The IJ didn't comment about it. It's been left open. Counsel, let me cut to the chase here. The issue for me in this case comes down to our standard of review. If we were deciding this case ourselves, your arguments are very persuasive, but we're not allowed to decide it for ourselves. We have to give great deference to the analysis of the BIA and the IJ. And I guess that's the sticking point for me. Why does the record compel a conclusion that it's more likely than not that your client will be tortured? Right. So the question is, does the court want to use the substantial evidence review of what the IJ did, or the BIA in its own decision? Is that the correct standard of review? That is correct. And remember, the court cannot disturb unless there is substantial evidence in the record. And this case is basically based on Aguilar v. Ramos, which this court has said in the past. If there's substantial evidence, if there's probative evidence in the record that could really swing this another way, simply making a blanket statement by saying, look, we don't believe that you carried your burden of proof, that will not stand. And this court said that on Cole. They said specifically, but where there is evidence and any indication that the BIA did not consider all of the evidence before it. Well, let me stop you for a moment. It appears to me that the BIA and the IJ did consider all the evidence, but simply weighed it differently than you would like us to weigh it. It seems that they concluded that it's not more likely than not that torture will occur, even taking into account the evidence that you presented. And I guess I'm just having trouble understanding why we are compelled to overturn that. Right. Well, let me go back into that, and that's more of a fact-based question. That's about Professor Andreevich's actual written testimony, and in that written testimony, he indicated that Mr. Kesko, upon return, would not in any way, because of his status as being a trader and a returned westerner, would not in any way have access to any mental health care. As a matter of fact, Bosnia-Herzegovina is pretty primitive to start with, and the documentary evidence indicated that all they had was institutionalized care. They have no neighborhood care. They have nothing. Let me just, because it's my understanding that Professor Andreevich's statement specifically says what you said, notes that Mr. Kesko may be seen as either a trader or a draft dodger or even a drugged-out criminal from the West and will receive a harsh treatment immediately upon his return to his native village. But isn't our duty to see if there's anywhere in the whole country that he can go? It doesn't have to be his native village. And are you saying that he can't go anywhere outside of his native village and not be a subject or afraid of torture? Actually, that is prior case law. If he can be relocated somewhere else in the country, then you cannot defer, the court could not defer removal. In this particular case, however, Professor Andreevich actually drew a conclusion in his opinion and said that there is no place that he could be returned in Bosnia-Herzegovina. He put that in his actual expert statement that's in part of the record and starts at AR 246. And he actually says that. There's no place where he's going to be safe if he gets returned to Bosnia-Herzegovina. And I guess if he does actually say that, because I thought his testimony said if he returned to his native village. You're saying there's somewhere in his report that he says if he goes anywhere? That's correct. He's saying his absence from the country, in my opinion, would be a great risk if returned anywhere in the Bosnian Serb Republic and the Federation of Bosnia-Herzegovina. That's AR 250, the last paragraph on the bottom of his printed testimony. But I guess what compels the reversal of the BIA's determination that he will be specifically subject to extreme pain, either mental or physical, based on his status, which is the majority status of people in Bosnia, by a public official. So if you can just tell me, because those are specifically what we have to find. Right, there's basically two elements in what Professor Andrejevic was speaking to. He was talking about the nationalist elements or the nationalist forces, which are composed of military and or police elements, state officials. And they go around and they actually target young people who are pro-West, refugee returnees, and this is also in the documentary evidence, such as Mr. Kesko. Mr. Kesko has had somebody from his town, Vancouver, who has actually returned and has been killed. So this is actually particularized, this has actually happened before. Now that's one half of it, and that's part of the aggregate that I would like to see the BIA do in reviewing everything. Now just looking at that, my major point here in this appeal is Mr. Kesko's mental illnesses, his PTSD and his depression, and he will get no treatment of the little bit of treatment that exists today in Bosnia and Herzegovina, which is only institutionalized. They have no community mental health services. Of that little bit of institutionalized mental health treatment that they have for his PTSD and depression, he will be denied that because he is pro-Western, because he is a returning refugee, and because he is being considered a traitor to his people because he left during that horrible civil war that the United States government even got involved in militarily. So we know from the previous case... Are you aware of any case law that holds that a lack of opportunity for treatment of a mental illness necessarily constitutes torture? No. A lack of the infrastructure, that is, if the United States were to return the person there and there's no infrastructure to provide medical care, is not a provision that you can seek for CAP protection for. However, in this particular case, if Mr. Kesko is returned, it's not simply a lack of infrastructure. The documentary evidence, the European Commission on Human Rights... Well, is there a different result sending someone back to a really impoverished country that has no mental health treatment and sending them back to a country that has some, but it won't be available to him? Yeah, there's a huge distinction in this particular case. Well, no, I know there's a factual distinction. I'm asking whether there is a distinction in terms of whether that would require us to consider the condition to be torture. Yes, and I think that's the case law in this circuit. That's Camalthus, that's Inu, and I think that's also restated in Cole. These are all things that this Court has already addressed before, that if you're going to return somebody to a country where they're going to, specifically under the CAT, where they're going to be returned and their mental health services or medical services are going to be withheld in retaliation for something that they engaged in in the past, that triggers the CAT. That's exactly what I briefed. That's exactly what I'm saying here. If Bosnia-Herzegovina had no medical infrastructure whatsoever, this argument could not fly. This argument could not happen. That is not the responsibility of the United States to make sure that a country that they return to has a medical infrastructure. That's not its obligation under the CAT. The CAT's very wide in taking in information, but it's very narrow in its application. There would have to be a medical infrastructure in Bosnia-Herzegovina to be denied to Mr. Kesko on the basis of CAT grounds before the CAT could take effect. Thank you, Mr. Kennedy. We'll hear from the government, and even though you used up your time, you may have a minute for rebuttal when the time comes. Thank you. I appreciate it. Ms. Smith? We don't hear you. Wait, stop. Stacy, what's happening? Let's try again. Good morning. Just let me know when the audio is on. Yes, we can hear you now. Thank you. The audio is on. Thank you. I expected a short delay. May it please the Court, Catherine Smith for the respondent. I'm appearing via video conference. Let me know if you have any problems understanding. This record does not compel a finding that Mr. Kesko is more likely than not to be tortured if returned to Bosnia. The evidence in this case was considered cumulatively weighed by the agency, and the generally poor conditions described in the evidence is insufficient for Mr. Kesko to meet his burden of proof. This isn't a case about the denial of mental health treatment. Mr. Kesko never testified that he's ever sought such treatment. He's never testified that he would seek such treatment in Bosnia. If he were interested in that, then the expert's statements would be taken into consideration, but there's no factual basis here that he had any interest in obtaining any kind of medical treatment. Likewise, this isn't a case about somebody with an accent. Mr. Kesko never testified that he has an accent or that he'd be identified as somebody from the United States. I thought there was some evidence that he is not particularly fluent anymore. I may be misremembering, and I can't recall now whether it was in the Andreevich report or elsewhere. Do you recall whether it was in the Andreevich report? Mr. Kesko himself? I don't believe there's any such evidence in the record. Mr. Kesko never said that he has problems speaking Bosnian, and the expert never actually met with Mr. Kesko or his family. It says so right in the front of his declaration. His declaration was based on the information provided by Mr. Kesko's attorneys. Would that make a difference to the outcome? I was looking at page 250 of the administrative record. The sentence in the report, I'm leaving out a few introductory words. Mr. Kesko is quite American and not as proficient in his native language. That was the sentence I was thinking of. That is the only sentence in the entire record that makes any mention to Mr. Kesko's language proficiency. So there's no factual foundation provided by Mr. Kesko or anybody who's actually met Mr. Kesko. And I think even if that was a fact in the record, that still wouldn't compel the conclusion that he would be tortured. He's never claimed that he fears torture as a result of his accent. Mr. Kesko himself fears the poor economic conditions in Bosnia. He's afraid he won't know anybody. He's afraid to go back to a place where he's experienced some horrible things. But it doesn't compel any kind of conclusion that there's an individual or a group in Bosnia that's more likely than not to actually torture him. Well, do you think he was tortured in the past? Isn't there evidence that he was tortured in the past? No, he never testified that he was tortured in the past. He said that he saw some horrible things that led to nightmares. There's been no finding of past torture. Counsel, the government stipulated that there was persecution. It didn't stipulate the torture. It stipulated there was persecution. Now, torture also always involves persecution, but persecution doesn't necessarily mean there was torture. But if there's persecution with a diagnosable mental condition related to that persecution, would that not be evidence of torture? There's been no finding made on that issue, so that would have to be something the agency would have to consider in the first place. The psychologist said there was a post-traumatic stress disorder following what he observed and what happened to him as a child in his native country, correct? That's correct. The social worker also noted that Mr. Keskos never sought treatment for that. Okay, well. He claimed that he would not be tortured in the future. Then we conclude, though, that he was subjected to persecution, which resulted in a diagnosed mental condition. That's what we're left with in the record, isn't it? Can you restate your question, I'm sorry? We are left with a record that he was persecuted because the government stipulated that, and that as a result of that persecution, he has post-traumatic stress disorder, right? Yes, that is correct. So can we not conclude on that basis that there was prior torture? There's been no finding on that exact issue. That might be a logical conclusion that one could reach, but it's not the basis for the agency's finding. The agency was tasked with the decision to find out whether or not he's more likely than not to be tortured in the future. Well, if there was torture in the past, it would be more likely that there would be torture in the future. That may be true under some circumstances. There certainly could be evidence that he'd be tortured in the future, right? Well, he was harmed under warlike conditions in the past when he was a child, conditions that no longer exist in the future. But there's been no finding either way whether or not this past harm gives rise to some sort of future presumption. The agency just looked at that factor. I'm sorry to interrupt. When you finish your answer, I have another question. Go ahead. To make that analysis, I'd be going beyond the board's decision. There's no evidence that there's anybody, there's a war going on that would result in more mental harm-type torture that would be inflicted. The conditions in Bosnia are quite different from when he left as a child. That's not something that the board analyzed. Are you aware of any precedent that holds that persecution resulting in a mental illness or a mental condition equates to torture? Or makes the persecution rise to the level of torture? I'm not aware of any case law on that issue, Your Honor. I think in this case, the agency looked at all the evidence in the record, the expert witness statement, the State Department reports that show that nobody's being tortured right now in Bosnia and gave it the weight that it's allowed to do at its discretion. I think this Court should not re-weigh the evidence or should uphold the board's finding that Mr. Kesko did not establish CAT eligibility. Did the IJ or the board find that he suffered from PTSD? It accepted the expert statement as credible, so it didn't make a separate finding. It just adopted what the expert said about him. And the expert was the social worker? Is that who you're talking to? No, the expert is a professor at a community college in Indiana, Mr. Andrejevic. The social worker just analyzed his mental state based on an interview she had with him. Right. That was her question. That's what I'm asking, though. I'm not sure. Was the professor qualified to give an assessment on PTSD? It was the social worker who gave the assessment, and the parties discussed it, and it basically came, there was no objection that she was qualified to give that assessment. You're talking about the social worker? Her qualifications were discussed. Well, who is Kathleen Pruitt MSW? That's the social worker. She's the social worker that met with Mr. Kesko personally and diagnosed him as having PTSD. So I was incorrect that it was a psychologist? That's correct. She was a social worker. Briefly, I'd also like to note that while this court has taken jurisdiction over these types of cases, it is the government's position that there is no jurisdiction over this case due to Mr. Kesko's aggravated felony and controlled substance offense, though I know the court has held otherwise. The panel has no further questions. Since there's just a couple minutes, can you, I guess, state again, you referred to it briefly before, the country conditions and how directly, if you could directly respond to this case with Mr. Kesko, how they've changed and why he wouldn't fear torture if sent back? The country conditions report used in this case was the 2009 State Department report, and the word torture only appears three times, first in the heading on the section on torture, and then in that section it discusses that people have sometimes reported mistreatment by the police while in police custody, and they describe that as punches, kicks, or hits to the body with batons. But there's no evidence of state-sanctioned or government-approved torture going on in Bosnia right now. So there's very little, if any, evidence of the typical kind of torture that you think about going on. If the panel has no further questions, the government is happy to rest on the brief. Do my colleagues have any other questions? No. I think not. Thank you. Mr. Kennedy, you may have a minute for rebuttal if you want it. Thank you, Your Honor. Regarding the country conditions, my client and trial counsel below the CFER did file reports from Amnesty International, the Helsinki Commission on Human Rights, and the Guardian newspaper article about the return of Bosnia-Herzegovina to the previous conditions while it was in civil war, especially Sarajevo. We are relying specifically on the European Commission of the European Communities report, Bosnia-Herzegovina 2009 progress report, that Bosnia-Herzegovina has not advanced beyond where they were, and that specifically they are in a state of flux, that there are still atrocities taking place, especially on repatriated refugees, people who have left Bosnia-Herzegovina, gone away, and are now trying to return. These people are specifically targeted for abuse, specifically the squads that I talked about earlier, for their political affiliations, in Mr. Keska's case, because he's affiliated with the United States and he speaks with a United States accent. Is there evidence of that in the record? In the documentary evidence, specifically within the European Commission report. No, no, about your client's accent. The sentence that I read in Mr. Andreevich's report talks only about being less fluent in his original language than he is in English, does not mention an accent. Is there specific evidence in the record beyond that? Yes, Your Honor, you're right. What page would I find that evidence? You're on Professor Andreevich's report page on AR-250. Right. The third line from the bottom, it says, Mr. Sadin Keska cannot hide his accent and his absence from his former country, and it is my opinion that he would be at great risk if returned anywhere in the Bosnian Serb Republic. And I believe he does repeat that somewhere else in here. He also says he's not proficient in his native language. This is all based on the expert's report, which in this particular case, he actually did a written report. He didn't testify. I know the government has briefed the distinction between filing the written report and testifying in great detail, but the government accepted this report, so it's a verity on appeal as far as we're concerned. Thank you, counsel. Thank you, Your Honor. We appreciate the arguments of both parties in this challenging case, and the case is submitted.
judges: Bury, Graber, Murguia